Yes, Your Honor. Case number 19-1793 from the Eastern District of Missouri, Carlden Trotter v. David Shipley, et al. Mr. Martin, are you with us? Is your camera connected? Yes, ma'am. I believe so. Can everybody hear me? Yes, I can hear you and have a visual as well. Mr. Martin, you may proceed when you're ready. Thank you, Your Honor. Good afternoon, Your Honors, and may it please the Court. My name is Jimmy Martin. I'm here on behalf of Carlden Trotter, the plaintiff appellant in this case. We are seeking to reverse three errors by the District Court made at trial in this matter. First, the District Court's decision to exclude and prohibit cross-examination about a termination letter written to one of the defendants, a prison guard, which we submit should have been admitted under Rule 404B or, at the minimum, cross-examination under Rule 608B. Second, the District Court's refusal to give an adverse inference instruction against the defendant who stopped participating in the case and was not present at trial. And third, the District Court's exclusion of evidence about the prison's failure to request video surveillance that would have captured the defendant's assault on Mr. Trotter in this case. We recognize the Court's standard of review on these issues is an abuse of discretion, and we recognize that that can be difficult to meet. We submit, Your Honors, that here that standard is met. These were clear and prejudicial abuses of discretion. So stepping back, Mr. Trotter alleged that he was beaten by defendants. In this case, Mr. Trotter at the time was a prisoner at the Missouri prison in Von Tare, and he sued for that beating under Section 1983, alleging use of excessive force by the defendants and also deliberate indifference to a serious medical need. There was evidence of his injuries sustained at the hands of the defendants, including two black eyes and other facial and head injuries. The defendants in this case arrived to find Mr. Trotter after he had beaten up one of their fellow guards. So they arrived to find their colleague beaten and bloodied, and the defendants did not deny that they escorted Mr. Trotter to his cell. They simply contended that it was done so in a professional manner, and they testified that they were not angered by finding their colleague bloodied at the hands of an inmate. And Trotter's version was that he was severely beaten. So there were two very different scenarios testified to at trial, Your Honors, and that's what made the District Court's errors in this case particularly harmful. Because the evidence that was excluded and the instruction that was not given tended to prove Trotter's case and tended to directly disprove defendants' case. And so we submit, Your Honors, that evidence and that instruction would have changed the tone of the trial, and there's no reasonable assurance that the outcome would have been the same. So turning to the first issue, the District Court refused to admit evidence of a termination letter that one of the defendants, David Shipley, received. And it detailed an incident in which Shipley had found – had come upon and participated in the escort of an inmate who had become assaultive toward another guard. So a very similar scenario to the one the jury was assessing at trial. The letter, which is addendum 14 to 17, details how Shipley came up and struck this inmate directly in the face with a closed fist. Shipley was found to have used excessive force and terminated for his actions. So we contend this evidence should have been admitted under Rule 404B as direct evidence of Shipley's intent, which is an element of a Section 1983 claim. Trotter had to prove under – for his Section 1983 excessive force claim that the defendants acted maliciously and sadistically with the purpose of causing harm. And so we submit this evidence went directly to intent. Counsel, if I could interrupt you. Go ahead. Well, Judge Trotter was at the same moment. You should go ahead today. I went ahead yesterday. Go ahead. Well, I just – I really had a question on the Rule 403 analysis, the balancing analysis the District Court did, which is you're right. It does highlight a specific incident in the past. But this letter does a whole lot more. And my understanding is the whole letter – you wanted the whole letter in without redaction, and it talks about some threats that were made against his wife. And I'm wondering whether that extraneous material alone supports what the District Court did on the balancing. Your Honor, I appreciate that concern. I would have offered a redacted version, but we didn't get that far in the record. And the other instances, as I said, could have been redacted, and the judge could have dealt with any other issues with eliminating instruction and eliminating instruction that talked about how this evidence was only to go to intent. And I think given it is direct evidence of – extrinsic evidence of intent, it's highly probative. And so I think that it's – the fact that it's highly probative, that outweighs the prejudice that you're highlighting. And as I've said, the portions that we wanted in had to do with his actions on finding this other inmate. We also think it went directly to motive, similarly, in that he finds this inmate having assaulted his fellow guard and is motivated to seek revenge and beat this guy up, just as Mr. Trier alleged he did in this case. And, Your Honors, we cited De Carson v. Polley, which we think is highly persuasive authority from the Fifth Circuit. Before you leave the letter, I had almost the same question but a little different flavor to it, which is you offered the letter all or nothing, right? My offer of proof was the letter. Right. That's correct. So first thing – and second thing is you did not offer a limiting instruction of any kind, right? I did not, Your Honor, but I believe – Sure. That's correct. Thank you. But I believe that we didn't get that far because the district court immediately ruled that it was not to come in. And so I think a limiting instruction could have dealt with any of the issues that we're talking about now. Mr. Martin, were you allowed to cross-examine Shipley about prior incidences? Your Honor, I was not. I was prohibited from cross-examining him about this instance in which, under 608B, we think the letter goes to his character for truthfulness as well. But I was not allowed to cross-examine about the prior instance of excessive force. So as I mentioned, Your Honors, we cited the Carson v. Polley, which is directly on point, and in which the Fifth Circuit reversed the district court's decision to exclude a report written about a prison guard who was being sued in a 1983 action just like here. And that report said that the guard did the work on controlling his temper and that he often argued with the inmates. And there were identical theories as to the theories of the case here in that the plaintiff in the case alleged excessive force used by the guards, and the guards said, no, we reacted coolly and professionally. And so the Fifth Circuit found that the guards' reaction was in part a matter of intent and found that that report tended to show the defendant's intent to do harm. And we think the letter tended to show Shipley's intent to do harm. And we think its exclusion was not harmless because of the two alternative scenarios which I have outlined. The letter tended to undermine defendants' facade that these sort of incidents never happened in prison. I think it diluted the credibility of defendants' assertions that they were not angered upon finding their colleague in the state he was in. And it supported Trotter's version and it bolstered Trotter's credibility. So we think it was not harmless and that it had a probable effect on the outcome of the trial. We touched on 608B, and so in the interest of time, I would like to move on to our second issue, which was the failure to give an adverse inference instruction regarding a missing defendant. Scott McFarland was a fellow guard. Counsel, I want to cut you to the chase. Boy, I read the words the district court says. They couldn't be more neutral. What's wrong with them? I agree they were neutral, Your Honor. But I think in this case, with a defendant who has stopped participating under this court's decision in McMillian, they needed to be words that admitted the facts alleged in the complaint. The district court indicated at the pretrial conference that it would be entering a default, that it would probably, the district court said it would probably enter a default against McFarland after the trial. And under the court's decision in McMillian, where that instruction... Now, McMillian is an agency case, right? There you can only get to the company if you get the president, right? It was an agency case, Your Honor, yes. But the court analyzed it and found that there was no joint liability there, so the instruction was proper. So here there's no joint liability either. Even though, as the court said in McMillian, the defendants here had closely related interests, there was a scenario in which McFarland could be liable and these other defendants could be found not liable. So I think that is a key takeaway from McMillian. And McMillian itself says when a default has been entered, facts alleged in the complaint may not be contested by the defaulted party. We think that should have been the instruction given as to McFarland. The instruction we offered is at JA-615. We offered it in a motion in Lemonnier. And we also said... Your Honor, I think also that would have been used as a sword against the other defendants. I mean, Judge Benton's right. When you're talking about an agency or a pawn of some sorts and you're using the pawn to get to the bigger fish, that's one thing. Here you'd be using the default of one defendant to go after equally big fish. In other words, the other defendants who committed the same acts. You don't think that's a problem to give such a strongly worded instruction under those circumstances? I don't, Your Honor. We've cited some cases, some district court cases from out of circuit where courts are talking about prejudicial spillover under another defendant not being a reason to not give an adverse inference instruction. And we think that under McMillian, the court acknowledged that the instruction that was given adversely determined the key material fact. That would not have been the case here. McFarland could have been found liable and could have committed the excessive force without these other defendants having done so. And we also cited the Baxter case from the Supreme Court where the court says an adverse inference is appropriate, where parties refused to testify in response to the evidence offered against them. What relevance is there, though, counsel, to the fact that the district court hadn't finally decided to give the default judgment? Said probably, but the default judgment hadn't been entered yet. Is there any relevance to that? We don't think there is, Your Honor. He was not he was not at trial. He we were deprived of the ability to get evidence from him. We were further prejudiced from the fact that we couldn't get his trial testimony, get another story out there for the jury to evaluate the credibility of in comparison to the other ones. And McFarland was alleged to have been the worst actor of the bunch. So I I see that I'm I'm at just two minutes left. And without any other questions on this issue, I would like to reserve the balance of my time. That's fine. The court will hear from Mr. Ossett. Thank you, Your Honors. And may it please the court. The court will hear from Mr. Ossett, the deputy solicitor general for the state of Missouri. The medical records speak for themselves. That's page 321 of the joint appendix. Which account is more believable, given the given the injuries. Three thirty six, the joint appendix. Those statements, Mr. Trotter's counsel made to the jury. With respect to the testimony that was presented at trial and the medical records. And none of that purposes of harmless error. Before I get to the error aspect of it, just to present this a little bit. None of that in the opening brief. And I think that's relevant for purposes of harmless error. In terms of. The questions that your honors just post to Mr. Martin. Just Ross and. Judge Benton, you asked about. The letter being offered completely without any redactions. If you go look at joint appendix, 22 and 24. The entire letter was offered. That's the offer of proof. The entire letter was offered without any redactions whatsoever. Judge Grender, you asked about. The opportunity to cross examine our position in the briefing. And a trial has been that it would have created a whole mini trial. About peripheral matters. That we didn't think was we're not. We're common enough with the issues in this case. But if you look at joint appendix at 36. Mr. Martin wanted to cross examine him about, about his truthfulness. And Mr. Shipley said. That he was going to dispute that he had lied in the letter. And so we'd be, we'd be having this whole mini trial about. What was said in the letter. What wasn't said it was just completely have detracted from. The primary issues in the case, which is what does the medical evidence. Show in this case. And whose account is more believable. And I think that just cuts right to the heart of this matter. Judge. If you look at. Oh, excuse me. And then one other question from. Judge Benson in terms of. McFarland look, the district court. Page six, 58 of the joint appendix struck his pleadings. They entered a default judgment. The court. Offered an instruction to the jury that his liability was not going to be at issue in this case. Juries. It's well established. Your honor. Jurors are presumed to follow the instructions. There's no evidence whatsoever that the juries were. As Mr. Martin says, in this brief, we're speculating as to where Mr. McFarland was. Or what we, what was he doing or anything like that? That's just not simply the evidence in this record. And to the point about McMillian or McMillan. That's absolutely right. Your honor. That was an agency case. And if you look at the opinion from. Pages 320 to 321. That's exactly what that case was about. We don't think that's analogous to this situation. And if I just made for the medical records, the reason I think that's important is even if this court assumes. That there was evidence here in this case. And we don't think there was, we think that judge Hampton did not abuse her discretion. If you look at the medical evidence, this case. It's just doesn't line up with this story. Dr. Brunig at pages 71 of the joint appendix and 91 92 said he did not see anything. Quote unquote alarming during his assessment of Mr. Trotter. And this was 30 plus hours after the incident occurred, nothing alarming that he would actually refer. His injuries or himself to his primary care physician. That's Dr. Brunig. That's his doctor. No complaints to nurse Lindquist, 30 plus hours after the incident occurred in page 61 of the joint appendix. And she even said they're not shy about those kinds of things. If in fact. Correct. His officer would have been up or something like that. That's something that's disclosed a nurse. McMaster's was not even employed by DOC. She's employed by an independent agency. She also did not see anything problematic with him. And then with nurse Lindquist at page 78 and 63 of the joint appendix, she did not see any problems with them below his eyes. The x-rays came back with no evidence of any skull fractures, no problems with, with opening his jaw. There were no missing teeth, no oral trauma. Just a bunch of other unbiased. Medical evidence that the jury was free to believe or disbelieve. And in this case, they believed the officer's testimony and they believe that the jury believed that that testimony was consistent with the evidence of the record. So I would just point out that we don't believe there's there in this case for the reasons that we, that I just stated to your honors questions and also to what we've said in the briefing. But I think even if you assume that there was air in this case, I just don't think the medical record or the medical evidence lines up with the story. Look at the end of the day, corrections officers have a very difficult job. And in part it's because they have to deal with difficult personalities and yes, it's going to involve some mild force, but that's not necessarily sadistic and malicious force. And clearly the jury saw in this case that that's not what they did. They fulfilled their duty. They acted professionally and we just don't believe in the jury. Certainly didn't believe that there were any issues in this case with respect to their credibility. They chose to believe their testimony and it aligned with the medical evidence. And that was enough for them. The your honors. I'm happy to go through the other points of air in our brief. It's really just going to be reciting the, the brief, but if there are no other questions I can sit down, but otherwise, we would just say that based on our briefing, there was no error in this case. Judge Hamilton did not abuse her discretion. And even if you assume that she did air in this case, or she did air in this case, it was not harmless error. I would implore you the same way that Mr. Martin had implored the jury in this case to look at the unbiased and indisputable medical record evidence. It just doesn't match up judges. And with that, if there are no other questions from the panel, I will rest on my brief and ask that the judgment be affirmed council. Can I ask one more question, which is what's the state? I know you went to harmless there. What's the state's position on whether the evidence here was proper under rule 404 B in other words, put the balancing aside. Do you think it was relevant for intent or motive? I don't, I don't think so. Judge. If you look at four 22, the joint appendix, Mr. Shipley testified at his deposition. This was in the offer of proof as well that he did not spit that Trotter did not spit on Mr. Shipley and the inmate in that letter had was about to spit on another colleague of Mr. Mr. Shipley. And so he tried to prevent the spitting from happening. Mr. Shipley testified as well that he didn't even know that officer Thomas was involved in the altercation until well after the incident, they weren't buddies. He said he wasn't mad about the incident. That's just the common occurrence or something that happens and they have to be professionals. So in terms of intent, I think they're just different events. I think it's difficult to show that two years after this happens somehow retroactively, he had this motive or intent, but at the end of the day, he's saying we get these 10, the 10, five calls all the time when officers need assistance and we have to respond in a neutral manner. And he was asked several times at the trial in terms of did that inflame your emotions or otherwise aggravate your, your perceptions of this case. And he said, no, unequivocally, they followed the proper course. And I think in terms of the letter showing some kind of intent or motive, I just don't see a judge. And frankly, I think the prejudice, as we've stated earlier would have just been very, it would just been very prejudicial to admit that letter into evidence. Thank you. Okay. Hearing no other questions. Thank you, Mr. Ascent, Mr. Martin, your rebuttal. Thank you, your honor. I just like to pick up on the tying, the verdict to the medical records evidence, and just point out that that's pure speculation. We don't know sitting here today, whether the jury found that these defendants lack the requisite intent. In other words, that they, that they lack the intent to act maliciously and sadistically for the purpose of causing harm. That could have been the reason for the jury verdict. And, and, and if that was the case, then our evidence goes, the letter goes directly to that. So asking your honors to look at the medical records and, and find that that's what the jury based its verdict off of is not, not the way this case should be decided at this point. And I think it's, I think it speaks volumes about how the failure to introduce to allow this letter to be introduced cast some, some doubt on the and on the outcome. And, and, and there's no reasonable assurance that, that the outcome wouldn't have been different. So what about the two and a half year gap? I asked you about some of the other things, but two and a half years is a long time, especially to show intent or motive. That'd be a long time to carry the same intent. What's your response to that? Your honor. My response to that is we cited the United States V Davis case in which this court found that a gap of up to eight years is quote similar in time under rule 404. And then we cited the U S V Robinson case, which said that three years is, is also similar in time. So we think it's, we think it's well within what this court has found to be close in time to to, to, to the prior instance. Thank you, your honors. Okay. Thank you, Mr. Martin and Mr. Osset. We appreciate your appearance today and in your briefing is submitted and we will decide it in due course.